# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-10111-KMH |
| | ) | |
| APOLLO ENERGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-10112-KMH |
| | ) | |
| DALE WALKER, | ) | |
| d/b/a RED CEDAR OIL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ——————————————— | ) | |

## <u>MEMORANDUM AND ORDER</u>

Defendants are charged with unlawfully "taking" migratory birds in violation of the

Migratory Bird Treaty Act, 16 U.S.C. §§ 703 & 707(a).[1]   The charges are based on dead

---

[1]   The charges are "Class B Misdemeanors."

migratory birds found in "heater/treaters" used in defendants' oil production equipment.[2]

On September 9, 2008, the court conducted a *Franks* hearing and denied defendants' motions to suppress. The two cases were jointly tried to the court following the ruling on the motions to suppress. After the submission of additional evidence and certain stipulations, the government rested and defendants moved for judgment of acquittal under Fed. R. Crim. P. 29(a). The court "reserved its decision" on the motions for acquittal pursuant to Rule 29(b) and proceeded with the trial. At the conclusion of the trial the matter was taken under advisement. This opinion (1) memorializes the court's oral ruling on the motion to suppress; (2) provides a written ruling concerning the trial as required by Fed. R. Crim. P. 23(c) and (3) resolves defendants' motions for acquittal.

### Motions to Suppress

The charges against defendants arise from evidence secured from search warrants

---

[2]

A "heater/treater" is a device which uses heat to assist in the separation of oil, gas, and salt water at the wellhead. The device is installed between the pumping unit and tank battery and, similar to a residential hot-water heater, is comprised of (1) a burner, (2) an exhaust stack, and (3) a tank. However, a heater/treater is made of industrial grade materials and is much larger. For example, the exhaust stack of a heater/treater is a pipe approximately six to nine inches in diameter and fifteen to twenty-five feet in height. The tank of a heater/treater is approximately three to four feet in diameter and ten to twenty feet in height.

Not all oil wells use "heater/treater" technology. The wells with heater/treaters in this case are located in and around south-central Kansas. For reasons unexplained, none of the heater/treaters in this case were "fired" or hot during any period relevant to this case. However, the heater/treaters remained in place with oil pumped through the device and into onsite storage tanks.

executed on heater/treaters owned and operated by defendants.  Defendants move to suppress the evidence, arguing that the affidavits used to establish probable cause for the search warrants contain "knowingly and intentionally" false statements in violation of the Fourth Amendment.  See Franks v. Delaware, 438 U.S. 154 (1978).[3]  Specifically, the affidavits contain statements by the investigating officer that on earlier visits to the heater/treaters he observed, *without moving any parts or equipment*, dead migratory birds in the heater treaters. Defendants contend the dead birds were not in plain view and that the officer manipulated parts of the heater/treater in order to see whether any birds were in the exhaust stack or burner assembly.  The circumstances surrounding the affidavits and the evidence are discussed in greater detail below.

### Apollo Energies, Inc.

John Brooks is a special agent with the United States Fish and Wildlife Service, Department of the Interior ("USF&W").  In November 2005 he received a call from a landowner reporting migratory bird remains in a heater/treater operated by Apollo Energies. Brooks inspected the heater/treater but found no bird remains because an Apollo employee had recently cleaned the heater/treater.  After interviewing the Apollo employee and

---

[3]

"It is a violation of the Fourth Amendment for an affiant to knowingly and intentionally or with reckless disregard for the truth, make a false statement in an affidavit."  U.S. v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001)(citing Franks v. Delaware, 438 U.S. 154, 171-72 (1978).  At a Franks hearing, the burden of proof is on the defendant to establish by a preponderance of the evidence that the affiant intentionally or recklessly misrepresented material information.  Franks, 438 U.S. at 156.

confirming that bird remains had been in the heater/treater, Brooks conducted a random inspection of ten heater/treaters in December 2005.[4]   Approximately one-half of the heater/treaters contained bird remains.

In February 2006 a task force of eight officers inspected 150 heater treaters over a two-day period in an effort to determine the extent of the problem.  Bird remains were observed in 65 heater/treaters and the officers collected approximately 300 birds, 10 of which were confirmed as migratory birds.[5]  Because of the number of dead birds found in the heater/treaters, the USF&W commenced an educational/outreach program in March 2006. The educational materials and information advised oil producers of the migratory bird problem and that USF&W would allow producers until January 1, 2007 to modify their equipment.[6]  The announcements also advised that inspections would be renewed after the grace period and that charges would be pursued for violations of the Migratory Bird Treaty

---

[4]

Brooks opened clean-out plates and/or pilot-light covers on the heater/treaters without permission or search warrants during his December 2005 investigation.  Brooks was later advised by the U.S. Attorney's Office for the District of Kansas that it was improper to manipulate or move equipment to look inside the heater/treaters without a warrant.

[5]

The remaining 290 birds were not submitted for forensic examination or otherwise confirmed as migratory birds.

[6]

The educational/outreach program included (1) the mailing of letters to members of the Kansas Independent Oil and Gas Association (KIOGA), (2) the distribution of posters to oil and gas equipment suppliers, (3) presentations at oil industry meetings, (4) articles in industry newsletters, and (5) a limited number of news media stories concerning the problem.  Only 40 percent of the oil and gas producers in Kansas are members of KIOGA so the individual letters mailed by the USF&W did not reach all oil producers.

Act discovered after January 1, 2007.

Brooks contacted the U.S. Attorney's Office for the District of Kansas in March 2007 to discuss USF&W's plans to renew its investigation of heater/treaters and the potential pursuit of criminal charges. Brooks was advised that agents could not manipulate or open any of the heater/treater equipment without a search warrant to gather evidence necessary to establish a violation of 16 U.S.C. §703. Brooks conveyed this information to members of his task force and four teams commenced new inspections in April 2007.

On April 24, 2007, Brooks inspected a heater/treater operated by Apollo Energies at the Herndon lease in Barber County, Kansas. Brooks noted that the top of the exhaust stack was not covered and, upon closer inspection, was able to see the carcass and feathers of what he believed was a Northern flicker through an open "view hole" or "cleanout" on the burner.[7] Based on his observations, Brooks sought and secured a search warrant. The search warrant was executed on April 27, 2007 and the carcass of a Northern flicker was recovered from Apollo's heater/treater. Apollo was subsequently charged by information with one count of violating the Migratory Bird Treaty Act for the Northern flicker found in its heater/treater.

Apollo's motion to suppress challenges the following statements in Brook's affidavit in support of his request for a search warrant:

> Closer inspection of the heater/treater revealed that the view hole in the cleanout was in the open position, which permitted viewing into the inside of the heater/treater. The view hole was not moved nor was

---

[7] A Northern Flicker is a migratory bird protected by the Migratory Bird Treaty Act. The "view hole" was also described as a pilot light hole with a pilot light cover during the *Franks* hearing and trial. Regardless of terminology, the cover could be in an open or closed position. The open position allowed a limited view into the heater/treater.

> the position altered by your Affiant, prior to, during, or after inspection.

Apollo contends that Brooks manipulated the view hole cover in order to see inside the heater/treater and that he knowingly and intentionally made false statements to secure the search warrant.

Apollo called Dennis Larkin, a contract pumper, as a witness in support of its motion. Larkin testified that he believed the view hole was closed on April 24, 2007. The United States countered with Brooks who testified that the view hole was open on April 24 when he inspected the site and was also open on April 27 when the search warrant was executed.

As noted above, defendant carries the burden of showing by a preponderance of the evidence that Brooks intentionally made false statements to procure the search warrant. <u>Franks</u>, 438 U.S. at 156. The court is not persuaded that Apollo has carried its burden of proof. Special Agent Brooks appeared to be a credible witness and his testimony was clear and specific about the open view hole on April 24. In contrast, Mr. Larkin testified about his *normal routine,* explaining that he usually spends only five to ten minutes a day at the site and (1) checks that the well is pumping, (2) looks for leaks, and (3) gauges [measures] the storage tanks for oil and salt water. However, Mr. Larkin had no specific recollection concerning the status of the view hole on April 24 or April 27. His belief that the view hole was closed is based on (1) his routine and (2) that he "would have noticed if it was opened."

The difficulty with Mr. Larkin's testimony is that the view hole cover is approximately three by four inches in size and relatively small in comparison to the rest of the equipment at the site. Moreover, the heater treater was not in use and had not been

"fired" for some time.  Except for observing whether the heater/treater was leaking fluids,

Mr. Larkin had no reason to pay any attention to the heater/treater on his daily visits.  Under

the circumstances, Mr. Larkin's testimony that believes he "would have noticed" that the

cover on the view hole was open is simply not persuasive when compared to Special Agent

Brooks' testimony.  Accordingly, Apollo's motion to suppress shall be DENIED.


### Dale Walker

Brooks also inspected a heater/treater operated by Dale Walker, d/b/a Red Cedar Oil

Company, at a location known as the Warren lease in Barber County, Kansas on April 24,

2007.  Similar to the inspection of the Apollo heater/treater, Brooks saw through a view hole

what he believed were the remains of migratory birds in Walker's heater/treater.  Based on

his observations, Brooks sought and secured a search warrant.  The search warrant was

executed on April 27, 2007 and two Northern flickers and one Eastern bluebird were

recovered.[8]

Walker's motion to suppress challenges the following statements in Brook's affidavit

in support of his request for a warrant to search the heater/treater on the Warren lease:

> Closer inspection of the heater/treater revealed that the view hole in
> the cleanout was in the open position, which permitted viewing into
> the inside of the heater/treater.  The view hole was not moved nor was
> the position altered by your Affiant, prior to, during, or after
> inspection.

Walker contends that Brooks knowingly and intentionally made false statements to secure

---

[8]

The Eastern bluebird is protected by the Migratory Bird Treaty Act.

the search warrant and that Brooks manipulated the view hole cover in order to see inside the heater/treater.

Brooks subsequently inspected another heater/treater operated by Dale Walker at a location known as the Baldwin/Warren lease in Barber County, Kansas on April 1, 2008. This heater/treater has a rectangular shaped cleanout covered by a louver on the lower portion of the burner. Brooks looked at the partially opened louver and saw what he believed to be the carcass of a common grackle.[9] Brooks returned on April 22, 2008 and took a picture of the carcass which was still stuck in the louver. Based on his observations, Brooks sought and secured a search warrant. The search warrant was executed on April 28, 2008 and one common grackle was recovered from Walker's heater/treater on the Baldwin/Warren lease.

Walker's motion to suppress also challenges the following statements in Brook's affidavit in support of his request for a second warrant to search Walker's equipment:

> Closer inspection of the heater/treater revealed that the cleanout louver was partially open, which permitted the viewing into the inside of the heater/treater cleanout. The louver was not moved, nor was the position altered by your Affiant, prior to, during, or after inspection.

Walker contends that Brooks knowingly and intentionally made false statements to secure the second search warrant and that the Brooks manipulated the louver to see inside the heater/treater.

Walker called Richard Wortman, the "pumper" for these two wells, in support of his

---

[9] The common grackle is protected by the Migratory Bird Treaty Act.

motion.  Similar to Larkin, Wortman testified that he never saw the pilot light cover open on the heater/treater at the Warren lease during April 24 through April 27.  With respect to the Baldwin/Warren lease, Wortman testified that, although he could not observe the louver on a daily basis, he would have closed the louver when he turned off the burner to the heater/treater.   Brooks testified on behalf of the United States that the louver on the heater/treater at the Baldwin/Warren lease was open as indicated by pictures attached to the search warrant application.

The court is not persuaded that Walker has shown that Brooks made false statements in his search warrant affidavits.  Again, Special Agent Brooks appeared to be a credible witness and his testimony was clear and unequivocal concerning the open view hole at the Warren lease on April 24 and 27, 2007 and the louver at the Baldwin/Warren lease on April 1, 22, and 28, 2008.  With respect to the Baldwin/Warren lease, Mr. Wortman was unable to testify as to whether the louver was open or closed on the days in question.[10]   More importantly, the photograph attached to the search warrant application shows a dead bird stuck in the louver, holding the vent partially open.  The bird carcass was visible without any need to manipulate or move the louver.

With respect to the Warren lease, Mr. Wortman testified that he had no specific recollection of the days in question but that he would have noticed if the pilot light cover was open.  Similar to the court's ruling concerning Apollo's motion to suppress, this testimony

---

[10]

    The louver faces downward and is approximately two feet above the ground.  In order to see whether the louver was open or closed, one would need to kneel down and then look up at the bottom of the burner and louver, something Mr. Wortman admits he did not do.

is not persuasive when compared to the more specific testimony by Special Agent Brooks.

Accordingly, Mr. Walker's motion to suppress shall be DENIED.


## Trial

As noted above, a bench trial of the two cases followed the *Franks* hearing.  Apollo Energies is charged with one count of violating the Migratory Bird Treaty Act, 16 U.S.C.§§ 703 & 707(a) based on the Norther flicker found in its heater/treater on April 27, 2007.  Dale Walker is charged with two counts of violating the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 & 707(a) based on the Northern flickers and Eastern bluebird found in his heater/treater on April 27, 2007 (Count I) and the common grackle found in his heater/treater on April 28, 2008 (Count II).

Under 16 U.S.C. § 703(a), it is

> unlawful at any time, by any means, or in any manner, to pursue, hunt, ***take***, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell ... any migratory bird, any part, nest of egg of any such bird ... included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds ... (Emphasis added).

16 U.S.C. § 707(a) is the penalty provision of the Migratory Bird Treaty Act and provides:

> Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulations made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more that $15,000 or be imprisoned not more than six months, or both.

Defendants stipulated that (1) they owned and operated the respective heater/treaters where the bird remains were found and (2) the Northern flicker, Eastern bluebird, and common grackle are migratory birds protected by the Migratory Bird Treaty Act. The United States then called Special Agent Brooks as its first witness. Brooks testified and again recounted (1) the initial complaint by a landowner in November 2005, (2) the February 2006 investigation of heater/treaters, (3) the education/outreach program and grace period, and (4) execution of the search warrants.

Prior to execution of the search warrant on Apollo's Herndon lease, Brooks called Jim Byers, the president and stockholder of Apollo Energy, Inc. and asked Byers to join him at the Herndon lease heater/treater. Byers was present when the search warrant was executed and observed the removal of the body of a Northern flicker and a starling from the Herndon heater/treater.[11] While at the well Byers confirmed receipt of the USF&W's 2006 educational/outreach letter. Byers later testified that he thought the problem been "taken care of" but that this heater/treater had apparently been missed.

Prior to execution of the search warrant on Dale Walker's Warren lease on April 27, 2007, Brooks called Mr. Walker and Mr. Walker met Brooks at the well site. When told that Brooks was executing a search warrant for migratory birds, Walker said he didn't know what

---

[11]

Apparently this particular starling was not a protected bird.

Brooks was talking about.[12]  When the bodies of two Northern Flickers and an Eastern bluebird were removed from the heater/treater, Mr. Walker said "that's not good."

Brooks inspected Walker's Baldwin/Warren lease in April 2008 and could see that some type of cap had been placed on the top of the exhaust stack.  However, when he looked at openings on the lower part of the burner, Brooks saw a dead bird wedged in the louvers.  The search warrant executed on April 28, 2008 allowed Brooks to move the louvers and he retrieved the body of a common grackle.  On cross-examination, Brooks agreed that birds could not enter the exhaust stack because it had been capped.  Brooks surmised that the grackle apparently entered the heater/treater through the louver and had been trapped.

The government's second witness was Dr. Pepper W. Trail, a forensic specialist/ornithologist for the USF&W.[13]  Dr. Trail confirmed that the birds removed from the heater/treaters were Northern flickers, an Eastern bluebird, and a common grackle.  He also testified that the Northern flicker prefers to roost in "cavities" and are attracted to manmade cavities.  The Northern flicker has a wing span of approximately 20 inches and would fold its wings to enter an exhaust stack to roost.  However, because the stack is only 6 to 9 inches in diameter, the flicker would be unable to spread its wings and escape.  Moreover, the flicker would be unlikely to climb out because the slick interior of the metal

---

[12]

Subsequent testimony revealed that Walker is not a member of KIOGA; therefore, he received no letter from the USF&W.  Walker also testified that he had not seen USF&W's posters or otherwise heard of USF&W educational/outreach efforts and grace period.

[13]

Defendants stipulated to Dr. Trail's expertise.

pipe would prevent its climb. The Eastern bluebird is similarly attracted to manmade cavities. Although it has only a 13 inch wingspan, it would also be trapped after entering a heater/treater exhaust stack. Eastern bluebirds prefer to roost and nest 12 to 15 above the ground but have been found as high as 30 feet. Northern flickers prefer to roost 15 to 30 feet above the ground but have been found as high as 40 feet.

The government rested after Dr. Trail's testimony and defendants moved for judgment of acquittal under Fed. R. Crim. P. 29, relying on legal arguments contained in their trial briefs and that the government's evidence did not show that defendants did anything "affirmatively wrong." The motions were taken under advisement and the trial continued.

Jim Byers testified for the defense of Apollo Energies. He explained that he is the president of Apollo and that the company operates approximately 50 wells with 14 employees and 36 contract pumpers. He has been involved in the oil business for 40 years and has observed bird remains and nesting material in heater/treaters. Upon receipt of the 2006 letter from the USF&W, he assigned his stepson the task of making modifications to the heater/treaters and, to his knowledge, thought the problem had been corrected.[14] However, based on his observations on April 27, 2007 when the search warrant was executed, he acknowledged that the Herndon heater/treater had not been modified. He assumes that his stepson simply overlooked this well site.

---

[14] Apollo currently is not "firing" the heater/treaters in its production operations. In approximately half of the heater/treaters a cap was lowered on the exhaust stack to prevent any birds from entering the heater/treaters. In other cases the burner was simply unbolted and removed, creating a large opening for birds to escape from the heater/treater.

Dale Walker testified in his own defense.  He contends he knew nothing about the problem with migratory birds in the heater/treater before execution of the search warrant on April 27, 2007.  He is not a member of KIOGA so he received no letter from USF&W and did not see any posters or news reports concerning the issue.  Walker talked to Brooks on April 27 about what needed to be done and remembers a discussion about placing some sort of cap on the exhaust stack.  In the weeks immediately following the April 27, 2007 search, Walker personally placed caps or screens on the exhaust stacks of the 14 heater/treaters he owns.

With respect to the April 28, 2008 search and discovery of the grackle in the louver, Walker testified that he had no idea a bird would enter the heater/treater from the louver at the bottom of the burner.  He also expressed the view that the "experts" at the USF&W should have told him what specific steps to take to prevent the problem and he believed that the government only asked that the exhaust stack be covered.  However, on cross-examination, Walker acknowledged receiving a June 18, 2007 letter from USF&W advising producers to cover "**any** openings large enough to allow a bird to enter the heater/treater." (Emphasis in original).

**Motion for Judgment of Acquittal**

Defendants assert three basic arguments in support of their motion for judgment of acquittal.  First, they argue that the "taking" violation found in 16 U.S.C. § 703 should not be construed as a "strict liability" offense.  In a closely related argument, defendants assert that § 703 requires, at a minimum, some type of wrongful affirmative act or negligence

-14-

before a criminal violation occurs.  Defendants contend that they were merely passive; therefore they should be acquitted.  Finally, defendants argue that a strict liability construction of § 703 would be unconstitutional as applied to defendants.

Defendants' first argument that § 703 is not a strict liability offense is foreclosed by Tenth Circuit precedent:

> Since its enactment, the majority of courts considering misdemeanor violations under § 703 of the MBTA have treated these offenses as strict liability crimes, eliminating proof of scienter from the government's case.  Although we have not previously so held, ***we now join those Circuits which hold misdemeanor violations under § 703 are strict liability crimes.***

U.S. v. Corrow, 199 F.3d 796, 805 (10th Cir. 1997)(citations omitted, emphasis added). Defendants attempt to distinguish Corrow, arguing that the case involved possession of protected feathers and that the Tenth Circuit has never expressly ruled on whether a "taking" is a strict liability offense.  However, as reflected in the above quoted language, Corrow holds that "misdemeanor violations [plural] under § 703 are strict liability crimes."  Because the Tenth Circuit expressly holds that misdemeanor violations under § 703 are strict liability crimes, this court is not at liberty to parse the language of the statute and hold that a "taking" violation is not a strict liability crime.

Defendants' related argument that they were passive and engaged in no affirmative acts or negligence is also not persuasive.  The evidence reveals that finding the remains of birds trapped in heater/treaters was relatively common in the industry yet defendants took

-15-

no action to correct the problem until prompted by the USF&W.[15]  The failure to act, with

knowledge that dead birds were often found trapped in the equipment, is a sufficient level

of culpable conduct for purposes of § 703.[16]  Equally importantly, the court is not persuaded

that defendants were "passive."   Defendants both owned and ***operated*** unshielded oil

production equipment that trapped birds.  Defendants were not "passive," standing quietly

on the sidelines.   They both actively operated equipment for the production of oil.

Accordingly, the court rejects defendants' argument that they engaged in no affirmative acts

or negligence and that they were merely passive actors.

Defendants' final argument is that applying a strict liability construction of "taking"

under the MBTA would be an unconstitutional violation of due process as applied to them.

See, U.S. v. Rollins, 706 F. Supp. 742 (D. Idaho).  Rollins involved a unique set of

---

[15]

Defendants argue that these oil treaters have been used for 40 to 50 years "without any problem" so it is unfair to now charge them with a violation of the Migratory Bird Treaty Act.  This argument is somewhat misleading because, while it is true that the USF&W only started its investigation of heater/treaters in 2005, oil operators have been aware for some time that bird remains are frequently found in heater/treaters.  Moreover, although these two cases are apparently the first prosecutions concerning heater/treaters in the nation, the government has pursued other cases under the Migratory Bird Treat Act for birds found trapped in oil pits and storage tanks.  See, e.g., U.S. v. Moon Lake Electric Association, Inc., 45 F. Supp. 2d 1070, 1083 (D. Colo. 1999)(citing three unpublished cases against oil companies for the death of birds from oil sump pits).  Mr. Byers acknowledges pleading guilty to a violation of the Migratory Bird Treaty Act for a migratory bird found in an oil storage tank on another lease.

[16]

This court agrees with Judge Babcock's well-reasoned analysis of the Migratory Bird Treaty Act in U.S. v. Moon Lake and that the government must prove "proximate causation" or "legal causation" beyond a reasonable doubt.  Id., 45 F. Supp. 2d at 1085.  The government has satisfied its burden of proof by showing that trapped birds are a reasonably anticipated or foreseeable consequence of failing to cap the exhaust stack and cover access holes to the heater/treater.

circumstances concerning migratory birds that died after eating alfalfa sprayed with a pesticide.  The evidence established that Rollins applied the pesticide in the "recommended quantities at the appropriate times" and  there were no signs of geese feeding on the alfalfa. The pesticide was applied in the same manner as Rollins had in the past and he had never experienced any problems with birds.  Farmers in the area were also unaware of any prior incidents where large numbers of geese had been killed following a pesticide application. Once the pesticide was applied, there was no effective way to keep geese out of the field. However, a flock of geese subsequently landed in Rollins' field and died from ingestion of the pesticide.

Based on the facts of the case, Judge Callister concluded that the Migratory Bird Treaty Act "does not give fair notice as to what constitutes illegal conduct so that Rollins could conform his conduct to the requirements of the law."  The ruling was based on evidence that Rollins had engaged in the innocent act of applying pesticides and that "nature took over in a manner totally outside his control."  Id. at 744-45.

The circumstances of these two cases are materially different.  In these cases there is knowledge in the oil industry that bird remains are frequently found in heater/treaters.  Most importantly, defendants had the means to prevent birds from being trapped in their heater/treaters by the relatively simple act of covering the exhaust stacks and access holes. Under the circumstances, Rollins is not persuasive.  Because the court is satisfied that § 703 and § 707(a) are not unconstitutional as applied to defendants, the defendants' motion for judgment of acquittal is DENIED.

## Conclusions of Law

### Apollo Energies, Inc.

Apollo Energies, Inc. owns and operates the heater/treater at the Herndon lease, located in the District of Kansas, in which the body of a Northern flicker was found on April 27, 2007.  The Northern flicker is a migratory bird protected by the Migratory Bird Treaty Act.  The fact that Apollo Energies made an effort to modify its equipment is not a defense to the charge but is a factor which will be taken into consideration at sentencing.  For the reasons set forth in this opinion, the court finds that the government has proven beyond a reasonable doubt that Apollo Energies violated 6 U.S.C. §§ 703 and 707(a) by illegally "taking" a Northern flicker and is guilty of Count One of the information.

### Dale Walker

Dale Walker owns and operates the heater/treater at the Warren Lease in which the bodies of two Northern flickers and an Eastern bluebird were found on April 27, 2007.  Dale Walker also owns and operates the heater/treater at the Baldwin/Warren Lease in which the body of a common grackle was found on April 28, 2008.  Both heater/treaters are located in the District of Kansas.  The Northern flicker, Eastern bluebird, and common grackle are migratory birds protected by the Migratory Bird Treaty Act.  Walker's argument that he knew nothing about the USF&W's educational/outreach program is not a defense to the charges because violations under 16 U.S.C. § 703 are strict liability crimes.  Walker's argument that he  took steps to correct the problem by capping the exhaust stacks is also not a defense but is a factor the court will consider at sentencing.  For  the reasons set forth

above, the court finds that the government has proven beyond a reasonable doubt that Dale Walker, d/b/a Red Cedar Oil, violated 6 U.S.C. §§ 703 and 707(a) and is guilty of Count One (illegally "taking" two Northern flickers and an Eastern bluebird) and Count Two (illegally "taking" a common grackle).

A telephone status conference will be conducted on September 29, 2008 at 11:00 a.m. with both counsel to discuss:

        1. a date for a sentencing hearing and

        2. other issues regarding sentencing.

If counsel are unavailable on September 29, they shall consult and report their suggested alternative dates for a status conference.

**IT IS SO ORDERED.**

Dated at Wichita, Kansas this 23rd day of September 2008.


S/ Karen M. Humphreys
_____
KAREN M. HUMPHREYS
United States Magistrate Judge